**NO SUMMONS ISSUED**

**CV 13-4995**

SLR:LDM:MS
F.# 2013V01156

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

        Plaintiff,

AMON, CH.J.

VERIFIED COMPLAINT
IN REM

  - against -

Civil Action
No. 13-CV-

ONE HUNDRED AND THREE THOUSAND SEVEN
HUNDRED AND TEN DOLLARS AND NO
CENTS($103,710.00), MORE OR LESS, IN
UNITED STATES CURRENCY, AND MONEY
ORDERS IN THE AMOUNT OF THIRTY-FIVE
THOUSAND NINE HUNDRED DOLLARS
($35,900.00), MORE OR LESS, SEIZED
FROM ALVIN MULERO-ROSARIO AT JOHN F.
KENNEDY AIRPORT ON OR ABOUT
FEBRUARY 4, 2013 AND ALL PROCEEDS
TRACEABLE THERETO,

        Defendants in rem.

- - - - - - - - - - - - - - - - - - - X

        Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH, United States Attorney for the Eastern District of New York, MATTHEW SILVERMAN, Assistant United States Attorney, of counsel, for its complaint alleges upon information and belief as follows:

1

**NATURE OF THE ACTION**

1. This is a civil action in rem brought by the United States to forfeit and condemn to the use and benefit of the United States of America the following funds in the total amount of one hundred and thirty-nine thousand, six hundred and ten dollars and no cents ($139,610.00), and all proceeds traceable thereto (collectively the "Defendant's Funds"), which are comprised of (a) one hundred and three thousand, seven hundred and ten dollars and no cents ($103,710.00) in United States Currency, and (b) forty-nine assorted money orders with a combined value of thirty-five thousand, nine hundred dollars and no cents ($35,900.00), which were seized on or about February 4, 2013, from the person and baggage of Alvin Mulero-Rosario ("Mulero-Rosario") at John F. Kennedy International Airport ("JFK") in Jamaica, Queens, New York, at JetBlue Gate 17 in Terminal 5.

2. The Defendant Funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as property traceable to the sale of narcotics; and/or 31 U.S.C. § 5317, as property involved in violations of 31 U.S.C. §§ 5324 and 5325.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355.

4.  Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a) in that the acts and omissions giving rise to the forfeiture occurred in the Eastern District of New York.

## STATUTORY AND REGULATORY PROVISIONS

5.  Pursuant to 21 U.S.C. § 881(a)(6), all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. (the "CSA"), all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate such a violation, are subject to forfeiture to the United States.

6.  Pursuant to 31 U.S.C. § 5325(a) and 31 C.F.R. § 1010.415, financial institutions issuing money orders in excess of $3,000 must obtain certain identifying information from the purchaser and record such information. Such transactions are subject to reporting to the Secretary of the Department of the Treasury upon request of the Secretary. 31 U.S.C. § 5325(b).

7. "Structuring" the purchase of money orders refers to the act of breaking down purchases of money orders into amounts of $3,000 or less in order to evade the requirement that the purchaser provide identification. See 31 U.S.C. § 5324(a).

8. Additionally, Title 31, United States Code, Section 5313(a) and its related regulations state that when a domestic financial institution, including money service businesses, is involved in a transaction for the payment, receipt, or transfer of U.S. currency in an amount greater than $10,000, the institution shall file a currency transaction report ("CTR") for each cash transaction.

9. CTRs are filed with the Financial Crimes Enforcement Network on forms that require disclosure of, among other information, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

10. These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are conducted by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any single business day.

11.  Many individuals involved in illegal activities, such as narcotics trafficking, tax evasion and money laundering, are aware of the reporting requirements and take active steps to cause financial institutions to fail to file CTRs in order to avoid detection of the movement of large amounts of cash.  These active steps are often referred to as "structuring" and involve making multiple cash transactions in amounts less than $10,000 on the same day or consecutive days in order to avoid the filing of CTRs.  Structuring is prohibited by 31 U.S.C. § 5324(a)(3).

12.  Pursuant to 31 U.S.C. § 5324, it is a crime for an individual to (1) "cause or attempt to cause a domestic financial institution to fail to file a report required under 31 U.S.C. § 5313(a)," (2) "cause or attempt to cause a domestic financial institution to file a report required under § 5313(a) that contains a material omission or misstatement of fact," or (3) "structure or assist in structuring, any transaction with one or more domestic financial institutions" for the purpose of evading the reporting requirements of 31 U.S.C. § 5313(a).

13.  Further, 31 U.S.C. § 5317 provides for the forfeiture of any property involved in violations of 31 U.S.C. §§ 5324 or 5313, or any conspiracy to commit any such

violations, and any property traceable to any such violations or conspiracy.

## FACTS

14. On February 4, 2013, at approximately 3:10 p.m., at JFK in Terminal 5, agents of the United States Drug Enforcement Administration ("DEA") approached a passenger named Robert Oliveras-Calderon ("Oliveras-Calderon"). Oliveras-Calderon was attempting to board JetBlue flight number 703 bound for San Juan, Puerto Rico.

15. After approaching Oliveras-Calderon, the agents asked Oliveras-Calderon who he was visiting with while in New York, and where he resided. Oliveras-Calderon was not able to provide the agents with any information regarding where he had stayed while in New York or where he had visited. The agents also asked Oliveras-Calderon if he possessed a substantial amount of currency. Oliveras-Calderon stated to the agents that he did not. Thereafter, Oliveras-Calderon consented to a search of his carry-on luggage by the agents.

16. During the course of the search of Oliveras-Calderon's carry-on luggage, DEA agents discovered large amounts of currency secreted in his carry-on luggage. This currency was hidden throughout Oliveras-Calderon's packed clothes, and

secreted in a pair of sneakers. Currency was also contained in white envelopes, wrapped in rubber bands. In addition, DEA agents discovered additional currency within Oliveras-Calderon's jacket pockets, and in multiple compartments of his fanny pack.

17. Upon finding this currency, DEA agents asked Oliveras-Calderon the source of this currency. Oliveras-Calderon could not provide any explanation. Oliveras-Calderon did, however, inform the DEA agents that he had additional currency contained within his checked luggage. At that time, Oliveras-Calderon also consented to the agents' search of his luggage.

18. While in the process of obtaining Oliveras-Calderon's checked luggage, DEA agents learned that Oliveras-Calderon was traveling with another individual, contrary to the information Oliveras-Calderon had previously provided the agents. Further, the agents discovered that Oliveras-Calderon and his travel companion, Mulero-Rosario, together, checked five pieces of luggage.

19. DEA agents obtained two pieces of luggage checked by Oliveras-Calderon. During a search of this luggage, agents discovered additional currency concealed and stuffed inside the pockets of several pairs of rolled up blue jeans, as well as

secreted between the pairs of jeans. Currency was also found packaged within white envelopes in a manner similar to the currency that was found inside Oliveras-Calderon's carry-on luggage.

20.  In total, DEA agents at JFK discovered that Oliveras-Calderon possessed sixty-one thousand eight hundred and ninety-four dollars and no cents ($61,894.00) in currency, which was seized and administratively forfeited based on Oliveras-Calderon's failure to file a claim for such funds.

21.  In addition to the bags checked by Oliveras-Calderon that had been searched at JFK, there was another bag checked by Oliveras-Calderon that remained on the plane. That bag was later intercepted when it arrived in Puerto Rico. Upon a search of that bag in Puerto Rico, DEA agents discovered an additional twenty-one thousand and six hundred dollars and no cents ($21,600.00) in currency.

22. After checking Oliveras-Calderon's bags, DEA agents boarded the JetBlue plane to speak to Oliveras-Calderon's travel companion, Mulero-Rosario. The DEA agents discovered that Mulero-Rosario had been in the bathroom at the rear of the plane for approximately ten to fifteen minutes.

23. After approaching Mulero-Rosario, the agents inquired as to whether he brought any carry-on luggage on the plane. Although Mulero-Rosario denied having any bags on the plane the JetBlue flight attendants identified carry-on luggage in the overhead compartments as belonging to Mulero-Rosario. Thereafter, Mulero-Rosario admitted that a computer bag and suitcase identified by the flight attendants were actually his carry-on luggage. Mulero-Rosario then consented to the search of those items.

24. During the search of Mulero-Rosario's suitcase, agents discovered currency hidden throughout his clothes in a manner similar to the currency found in Oliveras-Calderon's luggage. Further, this currency was also contained inside white envelopes and wrapped in rubber bands.

25. Additionally, agents searched Mulero-Rosario's computer bag and discovered forty-nine blank money orders in different denominations. These money orders had a cumulative value of over $35,000.

26. Mulero-Rosario also gave DEA agents consent to search his checked luggage. During the course of that search, agents discovered additional currency checked in two pieces of luggage. This currency was also hidden in clothes and found in

white envelopes in a manner which is consistent with the packaging of narcotics proceeds. Further, Mulero-Rosario maintained no documents with respect to the source of any of the currency or money orders he had in his possession.

27.  DEA agents asked Mulero-Rosario the source of the currency found in his luggage. Mulero-Rosario responded that the currency was from Pennsylvania. He told the agents he was unaware of the amount of currency in his possession.

28. DEA agents also discovered additional currency Mulero-Rosario was personally carrying. This currency was found in Mulero-Rosario's pants pockets and was also enclosed in white envelopes and tied with rubber bands.

29.  Mulero-Rosario also informed DEA agents that he was a co-owner of a company known as "CMR Contracting". This company is reportedly located in Puerto Rico. When asked about this company, Mulero-Rosario refused to provide any information, including the nature of the business. Further, Mulero-Rosario did not claim that the currency or money orders he was carrying were related to CMR Contracting business activities.

30.  At the end of the interview with Mulero-Rosario, DEA agents seized the Defendant Funds and the agents provided Mulero-Rosario with a receipt. The Defendant Funds seized from

Mulero-Rosario were comprised of (a) one hundred and three thousand, seven hundred and ten dollars and no cents ($103,710.00) in United States Currency, and (b) forty-nine assorted money orders with a combined value of thirty-five thousand, nine hundred dollars and no cents ($35,900.00).

31. On February 4, 2013, at JetBlue Terminal 5, Gate 17, a Nassau County Sheriff's Department narcotics detection K-9, "Sammy", positively alerted to the odor of narcotics on the currency and money orders seized from Mulero-Rosario. Also, Sammy positively alerted on the currency found on Oliveras-Calderon.

32. Notably, the Defendant Funds were being transported from New York, a source city for narcotics proceeds, to San Juan, Puerto Rico, a source city for narcotics. Typically, narcotics travel from San Juan to New York and narcotics proceeds travel from New York back to San Juan.

33. The Defendant Funds, which were seized from Mulero-Rosario's person, carry-on luggage, and checked luggage, totaled $103,710.00 in currency, and an additional $35,900 which was comprised of forty-nine assorted money orders. The currency was in the following denominations:

    a.    4,213 x $20.00 bills totaling $84,260

    b. 289 x $50.00 bills totaling $14,450

    c. 50 x $100.00 bills totaling $5,000

    d. 4552 bills totaling $103,710

  34. Narcotics dealers largely conduct their transactions in cash, using mostly $20 bills. A disproportionate number of $20 bills is indicative of cash proceeds of narcotics trafficking.

  35. The forty-nine money orders ranged in individual values from $400 to $1,000. Many of these money orders were made out in the amount of $1,000. Stacks of high-value money orders are also commonly used in narcotics trafficking, as they are easier to conceal than carrying large wads of cash.

  36. All but one of the forty-nine money orders possessed by Mulero-Rosario were purchased on February 2, 2013 and February 3, 2013. These money orders were all left blank.

  37. The forty-nine money orders possessed by Mulero-Rosario were purchased from seventeen (17) different locations in the Allentown, Pennsylvania area. Each money order was purchased in an amount no greater than $1,000.

  38. The practice of purchasing multiple money orders in amounts under $3,000, and within a short period of time, is common among narcotics traffickers seeking to avoid detection.

Financial institutions are required to obtain identification from purchasers of money orders valued at over $3,000 and to maintain records of such transactions. See 31 U.S.C. § 5325(a); 31 C.F.R. § 1010.415.

39. The sequence of these money order purchases demonstrates that Mulero-Rosario structured or conspired to structure the purchase of these money orders, in order to avoid reporting requirements, by procuring them from multiple vendors and financial institutions on February 2, 2013 and February 3, 2013.

40. Mulero-Rosario's money orders were obtained through structured purchases that took place almost entirely during a two-day period, and involved an aggregate sum of currency totaling well over $10,000. The purchase of monetary instruments in such amounts from a financial institution would ordinarily trigger a financial institution to file a CTR under 31 U.S.C. § 5313(a).

41. For example, Mulero-Rosario's Western Union money orders dated February 2, 2013 were cumulatively valued at fourteen thousand dollars ($14,000), and were purchased from four different Western Union vendors on February 2, 2013.

42. The money order purchases described in paragraphs 35 through 37, were structured in contravention of 31 U.S.C. § 5324, which makes it is a crime for an individual to cause or attempt to cause a domestic financial institution to fail to file a report required under 31 U.S.C. § 5313(a), which applies to currency transactions of $10,000 or more that are conducted within a single business day.

43. The DEA sent notices of the seizure of the Defendant Funds, dated March 19, 2013 (currency), and April 3, 2013 (money orders) to Mulero-Rosario.

44. On or about April 17, 2013 Mulero-Rosario filed a claim asserting an ownership interest in the seized currency of one hundred and three thousand, seven hundred and ten dollars and no cents ($103,710.00). On or about April 29, 2013, Mulero-Rosario filed a claim asserting an ownership interest in the forty-nine seized money orders with a combined value of thirty-five thousand, nine hundred dollars and no cents ($35,900.00). Mulero-Rosario also requested that the DEA refer the matter to the United States Attorney's Office for institution of a judicial forfeiture action.

**FIRST CLAIM FOR RELIEF**

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 above as if fully set forth herein.

46. The Defendant Funds constitute moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of the CSA, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the CSA.

47. As a result of the foregoing, the Defendant Funds are liable to condemnation and forfeiture to the United States in accordance with the provisions of 21 U.S.C. § 881(a)(6).

**SECOND CLAIM FOR RELIEF**

48. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 47 as if set forth fully herein.

49. The money orders that comprise Defendant Funds were involved in violations of, or attempts to violate, 31 U.S.C. § 5324, or are property traceable to such property.

50. As a result of the foregoing, the money orders that comprise Defendant Funds are liable to condemnation and forfeiture to the United States in accordance with 31 U.S.C. § 5317(c).

WHEREFORE, plaintiff, United States of America, requests that a Warrant of this Court issue for the arrest of the Defendant Funds; that due notice of these proceedings be given to all interested persons; that the Defendant Funds be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action, and for other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      September 5, 2013

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              *Attorney for Plaintiff*
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

           By: _____
                              Matthew Silverman (MS 4595)
                              Assistant U.S. Attorney
                              (718) 254-6409

## VERIFICATION

1. I am a Special Agent for the Drug Enforcement Administration, based at JFK International Airport, in Jamaica, Queens, New York.

2. I have read the Verified Complaint in rem in this action.

3. The matters contained in the within Verified Complaint in rem are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers and the official files and records of the DEA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Brooklyn, New York
       September 5th, 2013

                                                Antonino LoGrande
                                                Special Agent
                                                Drug Enforcement Administration
                                                Department of Justice